**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

**LORETTA LYNN NAYLOR,**

     **Plaintiff,**

                                   **Civil Action 2:15-cv-2817**

**v.**                                 **Judge James L. Graham**

                                   **Magistrate Judge Elizabeth P. Deavers**

**COMMISSIONER OF SOCIAL SECURITY,**

     **Defendant.**

**<u>REPORT AND RECOMMENDATION</u>**

Plaintiff, Loretta Lynn Naylor, brings this action under 42 U.S.C. § 405(g) for review of a final decision of the Commissioner of Social Security ("Commissioner") denying her application for social security disability insurance benefits. This matter is before the United States Magistrate Judge for a Report and Recommendation on Plaintiff's Statement of Errors (ECF No. 13), the Commissioner's Memorandum in Opposition (ECF No. 21), and the administrative record (ECF No. 10). For the reasons that follow, it is **RECOMMENDED** that the Court **REVERSE** the Commissioner of Social Security's nondisability finding and **REMAND** this case to the Commissioner and the ALJ under Sentence Four of § 405(g).

# I.   BACKGROUND

Plaintiff protectively filed her application for benefits in June 2012, alleging that she has been disabled since June 1, 2009,[1] due to degenerative disc disease, diabetes type 2, and a bulging/herniated disc.  (R. at 226-33, 247.)  Plaintiff's application was denied initially and upon reconsideration.  Plaintiff sought a *de novo* hearing before an administrative law judge. Administrative Law Judge Sabrina M. Tilley ("ALJ") held a video hearing on February 26, 2014, at which Plaintiff, represented by counsel, appeared and testified.  (R. at 88-98.)  Nancy Shapiro, a vocational expert, also appeared and testified at the hearing.

On April 24, 2014, the ALJ issued a decision finding that Plaintiff was not disabled within the meaning of the Social Security Act.  (R. at 67–79.)  On September 8, 2015, the Appeals Council denied Plaintiff's request for review and adopted the ALJ's decision as the Commissioner's final decision.  (R. at 1-7.)  Plaintiff then timely commenced the instant action.

In her Statement of Errors, Plaintiff asserts that the ALJ erroneously failed to consider her obesity at each step of the sequential evaluation.  She also asserts that the ALJ erred at step three of the sequential analysis.  Within this contention of error, Plaintiff challenges the sufficiency of the ALJ's rationale, as well as her reliance upon the absence of evidence of nerve root compression to conclude Listing 1.04 is not satisfied.  Finally, Plaintiff challenges the ALJ's consideration and weighing of the opinion of her treating physician.  Within this contention of error, Plaintiff maintains that the ALJ's analysis is insufficient because she fails to identify any objective findings that contradict her treating physician's opinion and further fails to offer any

---

[1]At the administrative hearing, Plaintiff amended her onset date of disability to June 1, 2011.  (R. at  89.)

reasons for her rejection of most of his opined limitations.  Plaintiff adds that the ALJ's reliance

upon an outdated opinion from a non-examining physician is "inexplicable."  (Pl.'s Statement of

Errors 14, ECF No. 13.)

      In her Memorandum in Opposition, the Commissioner asserts that the ALJ properly

considered Plaintiff's obesity at all steps of the sequential evaluation.  The Commissioner also

maintains that the ALJ properly articulated an explanation for her step-three finding, namely,

that the record did not reflect evidence of "nerve root compression, spinal arachnoiditis, or

lumbar spinal stenosis resulting in pseudoclaudication."  (Comm'r's Mem. in Opp. 15, ECF No.

21 (citing R. at 73).)  The Commissioner points out that the ALJ had considered the July 2013

MRI upon which Plaintiff relies to argue that the ALJ erred.  In addition, the Commissioner

posits that Plaintiff's challenge to the ALJ's step-three finding fails because she has failed to

identify evidence that she satisfied every part of the listing.  By way of example, the

Commissioner asserts that "Plaintiff has not shown evidence that she needed to change position

or posture more than once every two hours, or that she was unable to ambulate effectively, as

defined by Listing 1.00B2b."  (*Id*. at 16.)  The Commissioner further asserts that the ALJ

reasonably relied upon the state-agency reviewing physicians' opinions to determine that

Plaintiff's impairments did not meet or medically equal a listing.  Finally, the Commissioner

asserts that the ALJ properly evaluated the opinion of Plaintiff's treating physician and that she

did not err in relying instead upon the opinion of Dr. Manos because she had considered and

addressed the evidence that was generated after Dr. Manos rendered her opinion.

3

## II.   HEARING TESTIMONY

### A.   Plaintiff's Testimony

Plaintiff testified at the February 26, 2014, administrative hearing that she was five-feet-seven inches tall and weighed two hundred ninety-five pounds.  (R. at 94-95.)  She had not worked since June 1, 2011.  (R. at 88-89.)  After discussing her previous employment, Plaintiff acknowledged that her main issue is back pain.  (R. at  90-92)  She stated that she had "really sharp pains" in her lower back that radiated into her left leg and caused her left leg to go numb.  She described her pain as constant with varied intensity.  (R. at 92.)  She indicated that her pain worsened based on how she would sit, stand, or walk.  (R. at 92-93.)  Plaintiff testified that standing for a few minutes relieved her pain.  She estimated that she could stand for about ten minutes at a time.  Plaintiff said that she took Hydrocodone and Cyclopen for her pain and that she did not experience side effects from this medication.  She said that she stopped taking the medication Neurontin due to its side effects.  (R. at 93.)

Plaintiff also testified that she needed rotator cuff surgery on her right shoulder.  (R. at 93-94.)  She indicated that she was unable to lift anything with her right arm or hand without pain.  (R. at 94.)

Plaintiff estimated that she could walk for about ten-to-fifteen minutes on level ground before her leg felt heavy such that she had difficulty lifting it.  She indicated that her leg occasionally "gets real numb," which causes her to fall.  She estimated that she could stand and walk for a total of about three hours in an eight-hour day and sit upright for about fifteen-to-thirty minutes before she would need to get up and try to walk.  (R. at 95.)  She stated that she could sit upright a total of three-to-three-and-one-half hours in an eight-hour day.  (R. at 95-96.)

4

Plaintiff represented that she had been advised to lift no more than eight pounds, nor more than a gallon of milk.  She represented that she would not be able to lift a gallon of milk repeatedly because it would be very hard for her to grasp it with her right hand.  Plaintiff testified that she cannot do anything for long periods of time.  (R. at 96.)

Plaintiff next testified that she suffered from diabetes and that her blood sugar level had been running high due to pain she was experiencing and that her doctor thought that the numbness in her feet could be related to diabetes.  (R. at 97.)

As to her activities of daily living, Plaintiff testified that she occasionally folded clothes and washed dishes.  She said her husband helped her complete personal hygiene tasks, noting that he dried her legs and her back and assisted her with shaving her legs because she could not bend and twist and turn.  (R. at 96.)  She added that her husband did the grocery shopping. Plaintiff said that she was not driving at the time of the hearing due to the side effects of her pain medication and the numbness in her leg.  (R. at 97.)  She testified that she cooked occasionally, but that she had to have her husband place items within her reach and that she fixed everything on the stove top.  (R. at 97.)  She indicated that she did not vacuum.  (R. at 97-98.)

Plaintiff testified that she did not believe that she could perform a job that allowed her to sit during the entire day because it was hard for her to sit for very long due to her leg going numb; she added that she had to stand and try to walk frequently.  (R. at 98.)

**B.      Vocational Expert Testimony**

Nancy Shapiro testified as the vocational expert ("VE") at the February 26, 2014 administrative hearing.  (R. at 99-104.)  The VE classified Plaintiff's past relevant work as a cashier/stocker, a medium, semi-skilled position; a telemarketer, a sedentary, semi-skilled

position; an office assistant, a light, skilled position; and a claims examiner, a sedentary, skilled position.  (R. at 99.)

The ALJ proposed a series of hypotheticals regarding an individual with Plaintiff's age, education, and work experience and the RFC he ultimately assessed.  The VE testified that such an individual could not perform Plaintiff's past work with the exception of the telemarketing and claims adjuster positions, but could perform other jobs existing in substantial numbers in the regional and national economy, including the positions of cashier and addresser.  (R. at 101–03.) If, however, that same individual were unable to stay on task when she needed to stand up, she would not be able to sustain gainful employment.  (R. at 102–04.)

### III.   MEDICAL RECORDS

Plaintiff treated with primary care physician, Dr. Jared Sheets, M.D., since at least May 2009.  (R. at 450-575, 644-54.)

In April 2011, Dr. Sheets noted that Plaintiff fell two years prior and hurt her shoulder. At that time, she described her shoulder pain as "really bad" and said that she could not raise her arm.  (R. at 478.)  She had cortisone injections in January 2011.  (R. at 480-81.)  Plaintiff reported moderate to severe pain in her left shoulder with activity.  Her physician observed that her pain appeared to be worsening despite local injections and physical therapy.  Plaintiff exhibited moderate pain with passive movement of her left shoulder.  Plaintiff displayed markedly reduced range of motion, but exhibited full strength in her hands.  (*Id.*)  Her glucose level measured at 203.  (R. at 529.)  An MRI of Plaintiff's left shoulder taken on April 21, 2011, showed mild to moderate degenerative changes around the AC (acromioclavicular) joint; minimally deforms supraspinatus; and some minimal tendinosis.  (R. at 527.)

6

In May 2011, Plaintiff complained of back pain radiating down her left leg and foot.  She reported difficulty walking and standing at times.  (R. at 476.)  Her straight leg raise was positive on the left.  She exhibited 3-4/5 strength at her left knee.  (*Id.*)  Dr. Sheets ordered an MRI.

A May 2011 MRI of Plaintiff's lumbar spine showed small disk bulge at L3-4 and a large left paracentral disc herniation at L5-S1 level with caudal migration with a possibly extruded disc fragment.  These findings cause severe canal spinal stenosis as well as a left-sided foraminal impingement with severe impingement of the left S1 nerve root.  (R. at 526, 428.).

Plaintiff was referred to and examined by Dr. Ying H. Chen, D.O., a neurosurgeon, on May 10, 2011, due to complaints of a 2-week history of acute onset of severe symptoms of low-back pain and left lower extremity pain symptoms with paresthesias and with increasing weakness.[2]  (R. at 426.)  Plaintiff weighed 305 pounds.  Dr. Chen noted that Plaintiff exhibited significant diffuse pain over her lumbar/lumbosacral region with significant lumbosacral guarding secondary to her left leg pain symptoms.  Plaintiff's straight leg raising test was positive for radicular symptoms on her left side, but not her right.  Dr. Chen noted that Plaintiff displayed significant weakness of the dorsiflexion and plantarflexion at 3/5 to 4/5 on her left side in comparison to the right side at 5/5.  He also noted that Plaintiff's deep tendon reflexes were diminished.  (R. at 427.)  Dr. Chen described Plaintiff's gait as "severely antalgic favoring the left side."  (R. at 428.)  Based upon his examination and the MRI findings, Dr. Chen diagnosed "a large paracentral disc herniation with extruded disc fragment with severe spinal canal stenosis and neural foraminal impingement on the left side," which he noted correlated with Plaintiff's

---

[2]All of Dr. Chen's treatment notes are in the form of correspondence to Dr. Sheets.  The record further reflects that in addition to these narrative reports, Dr. Chen shared all test results with Dr. Sheets.

alleged symptoms of lumbar pain with extremity S1 radicular symptoms.  (*Id*.)  Dr. Chen noted

that she is not responding well to conservative treatments, including outpatient pain

management, steroid medications, and a membrane stabilizer.  Citing Plaintiff's "significant

weakness" that he attributed to "the severe compression of the nerve roots," Dr. Chen

recommended surgical decompression.  (R. at 428-29.)

On June 1, 2011, Plaintiff underwent a lumbar laminectomy, medial facetectomy,

foraminotomy, decompression of nerve roots, removal of the large extruded disk fragments at

L5-S1, a minimal diskectomy to further decompress the the bulging disk and neural elements.

(R. at 640-43; 388-91.)  In his surgical notes, Dr. Chen stated that "[i]t is quite evident that there

is a significant amount of mass effect upon the nerve root itself . . . ."  (R. at 642.)

When seen for a surgical follow-up visit in July 2011, Dr. Chen noted that Plaintiff was

doing well with mild, but tolerable pain symptoms.  Plaintiff reported that she was able to

discontinue taking her pain medications.  At a September 2011 follow-up visit, Plaintiff reported

that her left-pain symptoms had significantly subsided and that she was able to perform her

normal activities of daily living.  (R. at 422.)  She reported that she intermittently experienced

pain in her left-lower extremity that lasted approximately a day.  Dr. Chen observed that she was

able to ambulate.  He scheduled her for another follow-up appointment in three months.  In

November 2011, Plaintiff complained of some sciatic pain to Dr. Sheets.  (R. at 469.)

In January 2012, Plaintiff returned to Dr. Chen with complaints of "chronic on and off

symptoms of low back discomfort and left lower extremity pain."  (R. at 420.)  Dr. Chen

characterized her complaints of pain as being "in a similar distribution as previously described,"

adding "at this time, she may also have some L5 component on the lateral aspect of the thigh and

in the calf region." (*Id.*)  He described the results of his neurological exam to be "essentially unchanged," noting that Plaintiff had "very good lumbosacral range of motion and a good posture" with negative straight leg raise results and no detection of focal weakness.  Dr. Chen opined that her intermittent pain symptoms could either be attributable to continuing disc degeneration or the effects of the weather.  He recommended a follow-up in two months and an MRI if her symptoms had not improved.

Plaintiff underwent another MRI of her lumbar spine on March 19, 2012, which showed a recurrent disc herniation at the L5-S1 level with resultant effacement of the thecal sac, as well as left-sided neural foraminal impingement at L5-S1.  (R. at 525.)

At a March 30, 2012 visit with Dr. Chen, he noted that although Plaintiff had experienced significant resolution of her symptoms shortly after the surgery, she had now "developed recurrent symptoms of low back pain and left lower extremity pain symptoms in the L5-S1 distribution."  (R. at 418.)  Plaintiff reported that her symptoms were intermittent and increased with activity and that she tried to limit her bending and twisting.  Dr. Chen observed that her gait was fairly steady with minimal antalgia and minimal weakness in her left lower extremity with lumbrosacral guarding.  He opined that her pain symptoms were attributable to the recurrent disc herniation at the L5-S1 level.  He recommended that Plaintiff continue conservative treatments, but noted that if the symptoms did not improve, a repeat surgery may be an option.  Dr. Chen made a referral for Plaintiff to have a trial of epidural steroid injections and scheduled Plaintiff for a follow-up visit to assess if repeat surgery was warranted.  (R. at 418-19.)

At a June 2012 follow-up visit, Plaintiff reported that she was experiencing "daily severe back pain with activity as well as recurrent left lower extremity pain symptoms and

radiculopathy." (R. at 415.) Plaintiff reported that she tried to remain active as a housewife, but was having "significant difficulties" with her activities of daily living, including "having difficulty with bending and lifting." (*Id.*) Dr. Chen noted that the lumbar epidural injections gave Plaintiff only temporary relief. Upon performing a neurological exam, Dr. Chen observed lumbosacral guarding with limited range of motion, a significant amount of back pain, a positive straight leg raising on the left side with chronic persistent paresthesias in the L5-S1 distribution, mild weakness in dorsiflexion, and ambulation with an antalgic gait. Dr. Chen described Plaintiff's postlaminectomy syndrome as "quite severe," noting that she was experiencing recurrent symptoms with the underlying recurrent disc herniation. (R. at 416.)

In June 2012, Dr. Jed A. Bell, D.O. of Buckeye Spine and Rehab Physical Medicine and Rehabilitation, noted that despite trials of epidural steroid injections and physical therapy, Plaintiff continues to experience worsening severe back and left leg pain that had caused her fall twice in the past three weeks. (R. at 658-59.) Plaintiff had also noted that her leg felt heavy and numb. Upon physical examination, Dr. Bell noted decreased sensation in Plaintiff's left leg; significant pain, especially with plantar flexion; and pain on straight leg raises. He referred Plaintiff back to Dr. Chen for surgical intervention.

At Plaintiff's July 2012 appointment, Dr. Chen noted that Plaintiff continued to experience gradually increasing symptoms and that in the past month Plaintiff's legs gave out on her on several occasions, causing her to fall. (R. at 413.) Upon performing a neurological exam, Dr. Chen observed that Plaintiff "ambulates with a severely antalgic gait" and that she had some weakness in her left lower extremity. (*Id.*) He recommended another surgery.

On August 29, 2012, state-agency physician, Diane Manos, M.D., reviewed the record and assessed Plaintiff's physical functioning capacity. (R. at 141-50.) Dr. Manos opined that Plaintiff could lift and/or carry ten pounds occasionally (defined as "cumulatively 1/3 or less of an 8 hour day") and frequently (defined as "cumulatively more than 1/3 up to 2/3 of an 8 hour day"); stand and/or walk two hours in a workday; and sit for about six hours in a workday. (R. at 145.) She found Plaintiff's statements about the intensity, persistence, and functionally limiting effects of her symptoms to be substantiated by the objective medical evidence alone. Dr. Manos noted that the record reflected that Plaintiff had positive straight leg raise tests and a "severly antalgic gait." (R. at 147.) According to Dr. Manos, Plaintiff could frequently balance; occasionally climb ramps/stairs, stoop, kneel, or crouch; and never climb ladders, ropes, or scaffolds, or crawl. (R. at 146.) Plaintiff should not work around unprotected height or dangerous machinery due to her back pain. (R. at 147.) Dr. Manos found Plaintiff credible. (R. at 145.) Dr. Manos' opinion does not identify any Listings that she considered. (R. at 144-45.)

Plaintiff underwent surgery on September 10, 2012. (R. at 395-97; 635-639. Dr. Chen performed a complete lysis of adhesions, decompression of nerve roots at the L5-S1 level, an additional laminectomy and facetectomy, a foraminotomy, and a complete diskectomy with subsequent restoration of the disk space height using stabilization through posterior lumbar spinal fusion instrumentation at L5-S1 level. Dr. Chen's post-operative diagnoses included lumbar post-laminectomy syndrome with lumbar disk degernation, recurrent disk herniation causing low back pain and lumbar radiculopathy, and spinal stenosis. (R. at 635.)

11

In October 2012, one month following her back fusion surgery, Plaintiff reported that she was doing well, that her left lower extremity pain had greatly improved, and that she had experienced some resolution of her low back pain.  (R. at 662.)  Dr. Chen observed that Plaintiff displayed a mildly antalgic gait and continued to have some mild weakness in her dorsiflexion and plantarflexion.  He referred Plaintiff to physical therapy.

State-agency physician Maria Congbalay, M.D., reviewed Plaintiff's records upon reconsideration on November 9, 2012, and essentially affirmed Dr. Manos' assessment with the exception of finding that Plaintiff could lift and/or carry twenty pounds occasionally and ten pounds frequently and stand and/or walk for four hours in an 8-hour workday.  (R. at 152-62.)  Dr. Congbalay's opinion reflects that she considered Listing 1.04.

By December 2012, Dr. Chen noted that Plaintiff continued to have persistent parasthesia in her left lower extremity in the L5-S1 distribution.  (R. at 660.)  Dr. Chen noted that Plaintiff was in the process of completing physical therapy and that she continued to wear her back brace.  Upon performing a neurological exam, Dr. Chen observed lumbosacral guarding secondary to spasms and some chronic radiculopathy.  He observed that Plaintiff ambulated with slight antalgic gait and opined that she was slowly getting better.  Dr. Chen opined that Plaintiff's "chronic left-sided radiculopathy was perhaps due to scar tissue formation and manipulation of her nerve root during surgery," which he hoped would improve with time.  (R. at 661.)  He recommended that Plaintiff walk as much as she can, take pain medication, continue with the physical therapy program, and that she continue to utilize external bracing for support and continue her external bone growth stimulator for treatment. (R. at 660-61.)

When seen in June 2013, Dr. Chen noted that Plaintiff continued to notice discomfort in the posterior aspect of her left lower extremity in an L5-S1 distribution and that she had also started to get pain in her right lower extremity in an L5-S1 distribution, traveling down the posterior aspect of her leg.  Dr. Chen stated that the pain seemed to be related to "multiple spinal surgeries with postoperative fibrosis."  (R. at 613.)  Dr. Chen ordered a CT scan and MRI of her lumbar spine due to concerns about pseudoarthrosis.  (R. at 614.)

In March 2013, Plaintiff reported continuing discomfort in her lower back and left lower extremity.  (R. at 615.)  Dr. Chen noted that he ceased her physical therapy due to pain, which he opined was "related to multiple spinal surgeries with postoperative fibrosis."  (R. at 615.)  He noted that Plaintiff's pain symptoms had progressed with pain now also radiating into her right flank region and lumbosacral region.  He observed that Plaintiff continued to wear her lumbosacral brace.  Upon performing a neurological exam, Dr. Chen observed chronic bilateral paraspinal soft tissue changes with active guarding secondary to back pain and left lower extremity radiculopathy and neuropathy.  (*Id*.)  He indicated that she had positive straight leg raising in the L5-S1 distribution and that she displayed an antalgic gait. He noted that Plaintiff's spine x-ray revealed that she was lacking in bony formation in both the posterolateral gutter and the interbody disk space.  He recommended that Plaintiff undergo another MRI if her symptoms did not improve, adding that ideally, the next MRI would not be performed until a full year had passed after the second surgery to allow for bony fusion to occur.  (R. at 616.)

At the June 2013 appointment, Dr. Chen noted that Plaintiff had "[u]nfortunately . . . also begun to get pain in [her] right lower extremity also in an L5-S1 distrubution, traveling

down the posterior aspect of her leg." (R. at 613.) Dr. Chen opined that this was related to her spinal surgeries with postoperative fibrosis. Plaintiff had a negative bilateral straight leg. Dr. Chen assessed "recurrence of left lower extremity radiculopathy symptoms with new onset right lower extremity radicular symptoms." (R. at 614.) Dr. Chen recommended proceeding with a CT and MRI with development of a treatment plan following review of the results.

On July 9, 2013, Plaintiff underwent an MRI and CT of her lumbar spine. The MRI revealed that Plaintiff's "laminectomy defect is largely filled with enhancing scar [tissue that] extends into the posterior epidural space and around the left side of the thecal sac into the anterior epidural space." (R. at 651.) It further showed that the L5 nerve root is "encased" by the enhancing scar tissue and that the scar tissue also "extends into the inferior aspect of the left neural foramen producing moderate foraminal narrowing." (*Id*.) The MRI further revealed small midline posterior disc extrusions producing mild central canal impingement and a slight increase in the size of the disc extrusion at L4-5. The CT scan revealed mild facit hypertrophy and mild central canal and lateral recess stenosis due to mild disc bulging with small central disc protrusion at the L3-L4 and L4-L5. (R. at 653.) It also showed only "[m]inimal if any osseous bridging across the disc space." (*Id*.) The CT scan, like the MRI, revealed scar tissue ventral to the thecal sac and about the S1 nerve root. (R. at 653-54.)

Plaintiff reported to Dr. Chen on July 17, 2013. Upon examination, Dr. Chen observed that Plaintiff ambulates with a "narrow-based nonantalgic gait" and that she was able to go from seated to standing without assistance. (R. at 666.) Dr. Chen assessed "recurring left lower extremity radiculopathy symptoms due to postoperative fibrosis causing nerve entrapment at the left exiting L5 nerve root as well as recurrent minor disk protrusion at the

14

L5-S1." (R. at 667.)  He also noted that Plaintiff may have a possible cyst formation and the beginnings of degenerative disk disease and a broad-based central disk protrusion at the L4-L5 levels.  Dr. Chen discussed a trial of a spinal cord stimulator before further discussion of a third surgical revision.

Plaintiff also reported to Dr. Bell on July 17, 2013, with complaints of worsening, constant pain.  (R. at 655-56.)  She reported that she was able to wash, bathe, perform self care, and ride in a car.  Dr. Bell noted weakness and numbness in Plaintiff's left leg and foot.  He observed that she could ambulate without the use of a cane.  He discussed a trial of a spinal cord stimulator.

Plaintiff reported to Dr. Chen on November 27, 2013, complaining of increasing, relatively constant low-back pain.  (R. at 664.)  Examination revealed that Plaintiff continued to ambulate with a narrow-based nonantalgic gate and display balance and coordination within normal limits.  Dr. Chen observed that her strength was mildly diminished in her left lower extremity.  He indicated that Plaintiff had a mildly positive straight leg raise on the left.  Dr. Chen indicated that x-rays obtained that day revealed that Plaintiff had failed to develop "as much bridging bone as [he] would like for this stage in her healing." (*Id.*)  He discussed a potential third surgery in which he would revise the L5-S1 fusion and also extend the fusion up to the L4-L5 levels.  Dr. Chen also discussed a spinal cord stimulator trial and recommended that she consult a pain management specialist.  Plaintiff expressed that she would like to wait until after the holidays to make any big decision, which Dr. Chen noted was acceptable.  (R. at 664-65.)

15

On February 3, 2014, Dr. Sheets completed a form assessing Plaintiff's ability to do work-related activities.  (R. at 671-74.)  Dr. Sheets opined that Plaintiff could lift 8 pounds occasionally, but no weight frequently.  He added that "[t]hese are hard limits per neurosurgery."  (*Id.*)  Dr. Sheets next opined that Plaintiff could stand and walk 2 hours out of 8, but that she could only stand or walk 10 minutes without interruption.  He indicated that he premised this limitation on Plaintiff's "[r]esidual left sided lower extremity weakness following laminectomy and fusion" surgery.  (R. at 671.)  Dr. Sheets also opined that Plaintiff could sit 8 hours in an 8-hour work day, but without interruption for only 30 minutes, explaining that she "must stand briefly due to pain."  (R. at 672.)  Finally, Dr. Sheets opined that Plaintiff could never climb, balance, stoop, crouch, kneel, crawl due to "unstable L4/L5/S1 with motor weakness."  (R. at 672.)  The form permitted Dr. Sheets to choose between "frequently," defined as "from 1/3 to 2/3 of an 8 hour day"; "occassionally," defined as "from very little up to 1/3 of an 8-hour day"; or "never."  (R. at 671-72.)

## IV.   ADMINISTRATIVE DECISION

On April 24, 2014, the ALJ issued her decision.  (R. at 67–79.)  The ALJ found that Plaintiff last met the insured status requirements of the Social Security Act through September

30, 2013. (R. at 72.) At step one of the sequential evaluation process,[3] the ALJ found that Plaintiff had not engaged in substantially gainful activity during the period from her amended alleged onset date of June 1, 2011 through her date last insured of September 30, 2013. (*Id.*) The ALJ found that Plaintiff had the severe impairments of degenerative disc disease, status post-operative, lumbar radiculopathy, diabetes mellitus, and obesity. (*Id.*)

The ALJ next found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments described in 20 C.F.R. Part 404, Subpart P, Appendix 1, specifically comparing her impairments against Listings 1.04 (disorder of the spine), and 9.00 (Endocrine system). (R. at 73.) The entirety of the ALJ's step-three analysis provides as follows:

> The listing of impairments found in 20 CFR have been reviewed; specifically section 1.04 of the Listing of Impairments, involving disorders of the spine under musculoskeletal impairments. Upon review of the entire record, the undersigned

---

[3]Social Security Regulations require ALJs to resolve a disability claim through a five-step sequential evaluation of the evidence. *See* 20 C.F.R. § 416.920(a)(4). Although a dispositive finding at any step terminates the ALJ's review, *see Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007), if fully considered, the sequential review considers and answers five questions:

1.   Is the claimant engaged in substantial gainful activity?
2.   Does the claimant suffer from one or more severe impairments?
3.   Do the claimant's severe impairments, alone or in combination, meet or equal the criteria of an impairment set forth in the Commissioner's Listing of Impairments, 20 C.F.R. Subpart P, Appendix 1?
4.   Considering the claimant's residual functional capacity, can the claimant perform his or her past relevant work?
5.   Considering the claimant's age, education, past work experience, and residual functional capacity, can the claimant perform other work available in the national economy?

*See* 20 C.F.R. § 416.920(a)(4); *see also Henley v. Astrue*, 573 F.3d 263, 264 (6th Cir. 2009); *Foster v. Halter*, 279 F.3d 348, 354 (6th Cir. 2001).

finds no evidence of nerve root compression, spinal arachnoiditis or lumbar stenosis resulting in pseudoclaudication, which would be required to satisfy listing 1.04.  The provisions of section 9.00 of the Listing of Impairments was considered as well, and it has been concluded that these criteria have not been met.

(R. at 73.)

At step four of the sequential process, the ALJ set forth Plaintiff's RFC as follows:

After careful consideration of the entire record, the [ALJ] finds that, through the date last insured, the [Plaintiff] had the residual functional capacity to perform sedentary work as defined in 20 CPR 404.1567(a) except that she could walk no more than 10-15 minutes at one time; she could stand no more than 10 minutes at one time; and she could sit no more than 15-20 minutes at one time. She could never climb ladders, ropes, or scaffolds; she could occasionally balance, stoop, kneel, crouch, crawl, and climb ramps and stairs. She must avoid all hazards, such as unprotected heights and moving machinery.

(*Id.*)

In assessing this RFC, the ALJ concluded that Plaintiff's statements concerning the intensity, persistence, and limiting effects of her symptoms were not entirely supported by the objective record.  (R. at 74.)  She stated as follows:

Overall, the undersigned finds that Plaintiff has undergone multiple back surgeries, which certainly suggests that the symptoms were genuine.  However, ongoing treatment has not generally been what one would expect for a totally disabled individual.  In November 2013, [Plaintiff] was presented with three options for treatment; referral to pain management, a spinal cord stimulator, or more surgery.  She declined a decision until after the holidays and the current record does not indicate any commitment to a specific treatment plan.

(R. at 76.)

The ALJ accorded "some weight" to Dr. Sheets' opinion, finding Dr. Sheets' "extreme limitations" in Plaintiff's postural capacities "are not supported by objective findings in the record," explaining that his opinion that she could not stoop "prevents an individual from sitting which is inconsistent with [his] opinion that [Plaintiff] could sit for 8 hours in an 8-hour

18

workday." (R. at 77.)  The ALJ assigned "great" weight to the opinion of the state-agency reviewing physician, Dr. Manos, reasoning that "it is well supported by the evidence of record, as discussed in the body of this decision." (*Id.*)  She assigned "slightly less weight" to the opinion of the state-agency reviewing physician, Dr. Congbalay, stating that "the totality of this record supports a limitation to lifting and carrying no more than 10 pounds due to the combination of [Plaintiff's] symptoms." (*Id.*)

Relying on the VE's testimony, the ALJ concluded that Plaintiff can perform other jobs that exist in significant numbers in the national economy. (R. at 78-79.)  She therefore concluded that Plaintiff was not disabled under the Social Security Act. (R. at 79.)

## V.   STANDARD OF REVIEW

When reviewing a case under the Social Security Act, the Court "must affirm the Commissioner's decision if it 'is supported by substantial evidence and was made pursuant to proper legal standards.'" *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. 2009) (quoting *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007)); *see also* 42 U.S.C. § 405(g) ("[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . .").  Under this standard, "substantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers*, 486 F.3d at 241 (quoting *Cutlip v. Sec'y of Health & Hum. Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)).

Although the substantial evidence standard is deferential, it is not trivial.  The Court must "'take into account whatever in the record fairly detracts from [the] weight'" of the

Commissioner's decision.  *TNS, Inc. v. NLRB*, 296 F.3d 384, 395 (6th Cir. 2002) (quoting

*Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487 (1951)).  Nevertheless, "if substantial

evidence supports the ALJ's decision, this Court defers to that finding 'even if there is

substantial evidence in the record that would have supported an opposite conclusion.'"  *Blakley*

*v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (quoting *Key v. Callahan*, 109 F.3d 270, 273 (6th

Cir. 1997)).  Finally, even if the ALJ's decision meets the substantial evidence standard, "'a

decision of the Commissioner will not be upheld where the SSA fails to follow its own

regulations and where that error prejudices a claimant on the merits or deprives the claimant of

a substantial right.'"  *Rabbers*, 582 F.3d at 651 (quoting *Bowen v. Comm'r of Soc. Sec.*, 478

F.3d 742, 746 (6th Cir. 2007)).

## VI.   ANALYSIS

As set forth above, Plaintiff challenges the ALJ's consideration of her obesity, her step-

three listing articulation and conclusion; and her rejection of the limitations opined by her

treating physician in favor of an outdated opinion rendered by a state-agency reviewing

physician.  The Undersigned considers each of these contentions of error in turn.

### A.   Obesity

Social Security Ruling 02-1p addresses the evaluation of obesity for the purpose of

disability claims.  The Ruling assures that the Commissioner will consider a claimant's obesity

in evaluating steps two through five of the sequential analysis.  SSR 02-1p, 2000 WL 628049,

at *3 (Sept. 12, 2003).  When the medical or clinical records display a consistently high body

weight or body mass index ("BMI") an ALJ will typically rely on his or her "judgment to

establish the presence of obesity based on the medical findings and other evidence in the case

record, even if a treating or examining source has not indicated a diagnosis of obesity." *Id.*

Obesity will qualify as a severe impairment pursuant to step two "when, alone or in

combination with another medically determinable physical or mental impairment(s), it

significantly limits an individual's physical or mental ability to do basic work activities." *Id.*

at *4. "[N]o specific level of weight or BMI [] equates with a 'severe' or 'not severe'

impairment." *Id.* The ALJ "will do an individualized assessment of the impact of obesity on

an individual's functioning when deciding whether the impairment is severe." *Id.*

Ruling 02-1p further recognizes that obesity may contribute to and complicate "chronic

diseases of the cardiovascular, respiratory, and musculoskeletal body systems." *Id.* at *3. The

Ruling also cautions against making "assumptions about the severity or functional effects of

obesity combined with other impairments" and stresses that "[o]besity in combination with

another impairment may or may not increase the severity of functional limitations of the other

impairment." *Id.* at *6.

The United States Court of Appeals for the Sixth has emphasized that "Social Security

Ruling 02-01p does not mandate a particular mode of analysis." *Bledsoe v. Barnhart*, 165 F.

App'x 408, 411 (6th Cir. 2006) (finding, in case where medical reports described claimant as

morbidly obese, that "the ALJ does not need to make specific mention of obesity if he credits

an expert's report that considers obesity."); *see also Young v. Comm'r of Soc. Sec.*, No. 3:09

CV 1894, 2011 WL 2182869, at *7 (N.D. Ohio June 6, 2011) ("The Sixth Circuit requires the

ALJ to mention obesity either expressly or indirectly where the record includes evidence of

obesity's effects on the claimant's impairments."). Rather, Social Security Ruling 02-01p

"only states that obesity, in combination with other impairments, 'may' increase the severity of

the other limitations." *Bledsoe*, 165 F. App'x at 412. Furthermore, when the record contains only a limited amount of information concerning obesity, the Sixth Circuit has indicated that an ALJ may provide less articulation. *Nejat v. Comm'r of Soc. Sec.*, 359 F. App'x 574, 577 (6th Cir. 2009) (holding that when the claimant failed to list obesity in his application and when there was scant evidence of obesity in the record, it was sufficient for the ALJ to merely acknowledge the obesity diagnosis in his decision).

Finally, pursuant to the regulations, a claimant "must furnish medical and other evidence that [the Comissioner] can use to reach conclusions about your medical impairment(s) and, if material to the determination of whether you are blind or disabled, its effect on your ability to work on a sustained basis." 20 CFR § 404.1512. Accordingly, a claimant relying on obesity should provide evidence that obesity affected his or her ability to work. *See Cranfield v. Comm'r, Soc. Sec.*, 79 F. App'x 852, 857–58 (6th Cir. 2003) (concluding that even though doctor reports indicated obesity, the claimant's failure to provide evidence that her obesity affected her ability to work meant that "the ALJ and the district court had no obligation to address [her] obesity"); *see also May v. Astrue*, No. 4:10CV1533, 2011 WL 3490186, at *6 (N.D. Ohio June 1, 2011) (holding that an ALJ had no obligation to address a claimant's obesity when, even though the record contained a diagnosis of obesity, he did not demonstrate "functional limitations ascribed to the condition[]").

In the instant action, the Undersigned finds that the ALJ did not err in her consideration of Plaintiff's obesity. Notably, Plaintiff has failed to identify what additional limitations she has that the ALJ failed to consider that are attributable to her obesity. In her decision, the ALJ found Plaintiff's obesity to be a severe impairment, noting that Plaintiff's height, weight, and

BMI "places her weight in the range of extreme obesity."  (R. at 72.)  She explicitly discussed SSR 02-01p and represented that the considerations set forth within that Ruling were taken into account in reaching her conclusions.  (R. at 73.)  In addition, within her discussion of Plaintiff's admission to the hospital with swelling in her leg, the ALJ acknowledged that Plaintiff's "weight is also problematic and affects [her] symptoms of diabetes mellitus."  (R. at 76.)  Moreover, the ALJ accorded "great weight" to the opinion of Dr. Manos, who found obesity to be a severe impairment and had considered evidence reflecting Plaintiff's BMI of 45.  *See Coldiron v. Comm'r of Soc. Sec.,* 391 F. App'x 435, 443 (concluding that ALJ had sufficiently considered the claimant's obesity where he had considered the opinions of physicians who had acknowledged that the claimant was obese); *Bledsoe*, 391 F. App'x at 443 (ALJ properly considered the claimant's obesity where he made explicit mention of the claimant's obesity in his finding of facts and credited an expert's report that considered obesity).

In sum, because the Undersigned finds the ALJ's consideration of Plaintiff's obesity to be sufficient, it is **RECOMMENDED** that Plaintiff's first contention of error be **OVERRULED**.

**B.     Listing 1.04**

Within her next contention of error, Plaintiff challenges the ALJ's step-three analysis and conclusion that she did not satisfy Listing 1.04.

A claimant's impairment must meet every element of a Listing before the Commissioner may conclude that he or she is disabled at step three of the sequential evaluation process.  *See* 20 C.F.R. § 404.1520; *Duncan v. Sec'y of Health & Human Servs.*, 801 F.2d 847,

855 (6th Cir. 1986).  The claimant has the burden to prove that all of the elements are satisfied. *King v. Sec'y of Health & Human Servs.*, 742 F.2d 968, 974 (6th Cir. 1984).  The regulations provide that in making a medical equivalence determination, the Social Security Administration will "consider the opinion given by one or more medical or psychological consultants designated by the Commissioner."  20 C.F.R. § 404.1526(c).  Nevertheless, "[t]he burden of providing a . . . record . . . complete and detailed enough to enable the Secretary to make a disability determination rests with the claimant."  *Landsaw v. Sec'y of Health & Human Servs.*, 803 F.2d 211, 214 (6th Cir. 1986).  It is not sufficient to come to close to meeting the conditions of a Listing.  *See, e.g.*, *Dorton v. Heckler*, 789 F.2d 363, 367 (6th Cir. 1989) (Commissioner's decision denying benefits affirmed where medical evidence "almost establishes a disability" under Listing).

At issue here is the ALJ's consideration of Listing 1.04.  Listing 1.04 provides as follows:

> Disorders of the spine (e.g., herniated nucleus pulpsus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture), resulting in compromise of a nerve root . . . or the spinal cord.  With:
>
> A.    Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine);
>
> or
>
> B.    Spinal arachnoiditis, confirmed by an operative note or pathology report of tissue biopsy, or by appropriate medically acceptable imaging, manifested by severe burning or painful dysesthesia, resulting in the need for changes in position or posture more than once every 2 hours;
>
> or

24

C.      Lumbar spinal stenosis resulting in pseudoclaudication, established by findings on appropriate medically acceptable imaging, manifested by chronic nonradicular pain and weakness, and resulting in inability to ambulate effectively, as defined in 1.00B2b.

20 C.F.R. Part 404, Subpart P, Appendix 1, § 1.04.

The Undersigned agrees with Plaintiff, that the ALJ erroneously concluded that Plaintiff's impairments did not meet or equal Listing 1.04 because she found "no evidence of nerve root compression, spinal arachnoiditis or lumbar spinal stenosis resulting in pseudoclaudication."  (R. at 73.)  Contrary to the ALJ's assertion, the record contains evidence of both nerve root compression and lumbar spinal stenosis resulting in pseudoclaudication.[4] (*See* R. at 428, 526 (2011 MRI showed findings causing severe spinal stenosis and foraminal impingement with severe impingement on the left S1 nerve root, which Dr. Chen indicated correlated with Plaintiff's alleged symptoms of lumbar pain and extremity radicular symptoms); R. at 642 (surgeon noted that "[i]t is quite evident that there is a significant amount of mass effect upon the nerve root iteslf"); R. at 525 (2012 MRI showed left-sided neural foraminal impingement); R. at 418-19 (Dr. Chen noted that Plaintiff had developed recurrent symptoms, including weakness and pain in her lower extremity, despite initial relief of symptoms following surgery); R. at 395-97, 635-39 (September 2012 surgery involved decompression of nerve roots and post-operative diagnoses included spinal stenosis); R. at 613

---

[4]"Pseudoclaudication is defined as "[p]ain in the lower extremities that develops when patient are standing for a long time.  The pain is relieved by leaning forward or by sitting.  It is caused by lumbar spinal stenosis and not by impaired blood flow through the aorta, iliac, or femoral arteries."  www.medical-dictionary.thefreedictionary.com/psuedoclaudication (last visited June 15, 2016); *see also See also Lehman v. Astrue*, 931 F. Supp. 2d 682, 690 n.4 (D. Maryland 2013) ("Pseudoclaudication is defined as pain, tension and weakness in the back and lower limbs, generally caused by spinal stenosis." (citing Elsevier Saunders, *Dorland's Illustrated Medical Dictionary* at 369 (32d ed. 2012).

(Dr. Chen assessed recurrent left lower extremity radiculopathy symptoms with new onset of right lower extremity radicular symptoms); R. at 651-54 (July 2013 MRI and CT scan revealed mild central canal and lateral recess stenosis and scar tissue encasing the L5 nerve root); R. at 666-67 (Dr. Chen assessed recurring left lower extremity radiculopathy symptoms and nerve entrapment at the L5 nerve root).)  The Undersigned therefore finds that the ALJ erroneously prematurely ended her Listing 1.04 analysis after concluding that the record contained no evidence of nerve root compression, spinal arachnoiditis, or lumbar spinal stenosis resulting in pseudoclaudication.

The issue, then, is whether the ALJ's erroneous justification for concluding that Plaintiff did not satisfy Listing 1.04 is harmless.  On this point, the Commissioner contends that Plaintiff failed to supply evidence that reflects that she satisfies every element of Listing 1.04 and that the ALJ "reasonably relied" on the opinions of the state-agency physicians to conclude that Plaintiff impairments did not meet or medically equal a listing.  (Comm'r's Mem. in Opp. 16, ECF No. 21.)

The Commissioner's reliance upon the ALJ's adoption of the opinions of the state-agency physicians with regard to her step-three findings is unavailing for several reasons.  First, the ALJ does not mention the opinions of the state-agency physicians within her step-three analysis but instead offers a concrete, evidentiary basis for her conclusion that neither Drs. Manos nor Congbalay endorse in their opinions.  Second, review of Dr. Manos' opinion reveals that she did not identify any Listings that she considered or otherwise offer an opinion about whether Plaintiff's impairments meet or medically equal a listing.  (*See* R. at 144-45.)  And although Dr. Congbalay noted that she had considered Listing 1.04, the ALJ did not fully

26

credit her opinion because she found that the record supported a finding that Plaintiff was more limited than Dr. Congbalay opined. (R. at 152-62, 77.) Finally, Drs. Manos and Congbalay offered their opinions in August 2012 and November 2012, respectively. Thus, they did not have the benefit of the medical evidence following Plaintiff's second surgery, including examination notes from Plaintiff's treating physicians, x-rays, a CT scan, and an MRI.

The Commissioner's second articulated basis for asserting harmless error, that Plaintiff has failed to identify evidence reflecting that she satisfied every element of the Listing 1.04, presents a closer call. As discussed above, the record Plaintiff supplied contradicts the ALJ's conclusion that there exists "no evidence" of nerve root compression or lumbar spinal stenosis resulting in pseudoclaudication. (R. at 73.) But to satisfy subsection A under Listing 1.04, nerve root compression must be accompanied by sensory or reflex loss, as well as positive straight-leg raising tests in the sitting and supine positions given that there is involvement of Plaintiff's lower back. *See* 20 C.F.R. Part 404, Subpart P, Appendix 1, § 1.04(A). Alternatively, Plaintiff could proceed under Subsection C of Listing 1.04, which requires her to show that her lumbar spinal stenosis resulted in "inability to ambulate effectively, as defined in 1.00B2b. *Id*. at § 1.04(C). Thus, unless the record Plaintiff supplied reflects that she either (1) had positive straight-leg raising test in the sitting and supine positions; or (2) could not ambulate effectively, the ALJ's erroneous step-three analysis is harmless. *See Thacker v. Social Sec. Admin.*, 93 F. App'x 725, 728 (6th Cir. 2004) ("When a claimant alleges that he meets or equals a listed impairment, he must present specific medical findings that satisfy the various tests listed in the description of the applicable impairment or present medical evidence

which describes how the impairment has such equivalency." (citing *Buress v. Sec'y of H.H.S.*, 835 F.2d 139, 160 (6th Cir. 1987)).

Although the record contains evidence reflecting that Plaintiff intermittently had positive straight-leg raising tests, it fails to indicate whether these positive results were in both the supine and sitting positions as required under subsection A of Listing 1.04.  (*See* R. at 476 (straight leg test positive on the left); R. at 426 (same); R. at 420 (negative straight leg test); R. at 415-16 (positive straight leg test on left); R. at 658-59 (positive straight leg test); R. at 615-16 (positive straight leg test); R. at 613 (negative straight leg test); R. at 664 (mildly positive straight leg raise test on the left).)  Given the lack of consistency in her straight leg testing results, together with the absence of any indication reflecting whether the tests in which there were positive findings were performed in both the sitting and supine positions, the Undersigned is hesitant to conclude that the record supplies substantial evidence in support of a determination that Plaintiff satisfies Listing 1.04 under subsection A.  *See Plaghe v. Comm'r of Soc. Sec.*, No. 15-11920, 2016 WL 1714733, at *14 (E.D. Mich. Apr. 28, 2016) (collecting cases establishing that a "[l]ack of evidence that the straight-leg test was positive in both the sitting and supine position is itself sufficient to preclude a claimant from meeting Listing 1.04A").

The record likewise does not supply substantial evidence in support of a determination that Plaintiff had an "inability to ambulate effectively.  An "inability to ambulate effectively" is defined as follows:

b. What We Mean by Inability To Ambulate Effectively

(1) Definition. Inability to ambulate effectively means an extreme limitation of the ability to walk; i.e., an impairment(s) that interferes very seriously with the

individual's ability to independently initiate, sustain, or complete activities. Ineffective ambulation is defined generally as having insufficient lower extremity functioning (see 1.00J) to permit independent ambulation without the use of a hand-held assistive device(s) that limits the functioning of both upper extremities. (Listing 1.05C is an exception to this general definition because the individual has the use of only one upper extremity due to amputation of a hand.)

(2) To ambulate effectively, individuals must be capable of sustaining a reasonable walking pace over a sufficient distance to be able to carry out activities of daily living. They must have the ability to travel without companion assistance to and from a place of employment or school. Therefore, examples of ineffective ambulation include, but are not limited to, the inability to walk without the use of a walker, two crutches or two canes, the inability to walk a block at a reasonable pace on rough or uneven surfaces, the inability to use standard public transportation, the inability to carry out routine ambulatory activities, such as shopping and banking, and the inability to climb a few steps at a reasonable pace with the use of a single hand rail. The ability to walk independently about one's home without the use of assistive devices does not, in and of itself, constitute effective ambulation.

20 C.F.R. Part 404, Subpart P, Appendix 1, § 1.00(B)(2)(b).

Here, the record contains some evidence to suggest that Plaintiff struggles with her ability to ambulate and carry out routine ambulatory activities. (*See, e.g.*, R. at 96-97 (Plaintiff's testimony that her husband did the grocery shopping and that in order to cook, her husband had to place items within her reach); R. at 476 (reporting difficulty walking); R. at 428 (describing Plaintiff's gait as "severely antalgic"); R. at 413 (Plaintiff reported her legs giving out, causing her to fall, and Dr. Chen observed that she ambulated with a "severely antalgic gait").) But the overwhelming evidence reflects that Plaintiff does not have "an extreme limitation of the ability to walk . . . ." as contemplated under § 1.00(B)(2)(b). (*See, e.g.*, R. at 422 (Plaintiff reported performing her normal activities of daily living following the 2011 surgery); R. at 418-19 (Plaintiff displayed fairly steady gait with minimal antalgia); R. at 662 (Plaintiff displayed mildly antalgic gait); R. at 660 (Plaintiff displayed slight antalgic gait);

R. at 666 (observing Plaintiff to ambulate with a narrow-based non-antalgic gait); R. at 655-56 (noting that Plaintiff could ambulate without the use of a cane); R. at 664 (Plaintiff again observed to ambulate with a narrow-based non-antalgic gait).  The Undersigned therefore declines to conclude that the record supplies substantial evidence that could support a finding that Plaintiff is unable to ambulate effectively as defined in 1.00(B)(2)(b).  In the absence of such a finding, Plaintiff cannot satisfy Listing 1.04 under subsection C.

In sum, even though the ALJ erred at step three in concluding that the record contains no evidence of nerve root compression or lumbar spinal stenosis resulting in pseudoclaudication, this error was harmless as to her step-three finding because Plaintiff has not satisfied her burden to demonstrate that she satisfies every element of Listing 1.04.  It is therefore **RECOMMENDED** that the Commissioner **OVERRULE** Plaintiff's second contention of error.

## C.    Consideration and Analysis of the Opinion Evidence and RFC Formulation

In her final contention of error, Plaintiff challenges the ALJ's rejection of the limitations her treating physician opined in favor of crediting an outdated opinion from a state-agency physician in arriving at her RFC determination.

A plaintiff's RFC "is defined as the most a [plaintiff] can still do despite the physical and mental limitations resulting from her impairments." *Poe v. Comm'r of Soc. Sec.*, 342 F. App'x 149, 155 (6th Cir. 2009); *see also* 20 C.F.R. §§ 404.1545(a), 416.945(a).  The determination of RFC is an issue reserved to the Commissioner.  20 C.F.R. §§ 404.1527(e), 416.927(e).  Nevertheless, substantial evidence must support the Commissioner's RFC finding. *Berry v. Astrue*, No. 1:09CV000411, 2010 WL 3730983, at *8 (S.D. Ohio June 18, 2010).  An

ALJ is required to explain how the evidence supports the limitations that he or she set forth in

the claimant's RFC:

> The RFC assessment must include a narrative discussion describing how the
> evidence supports each conclusion, citing specific medical facts (e.g., laboratory
> findings) and nonmedical evidence (e.g., daily activities, observations).  In
> assessing RFC, the adjudicator must discuss the individual's ability to perform
> sustained work activities in an ordinary work setting on a regular and continuing
> basis (i.e., 8 hours a day, for 5 days a week, or an equivalent work schedule), and
> describe the maximum amount of each work-related activity the individual can
> perform based on the evidence available in the case record.  The adjudicator must
> also explain how any material inconsistencies or ambiguities in the evidence in the
> case record were considered and resolved.

S.S.R. 96–8p, 1996 WL 374184, at *6–7 (internal footnote omitted).  When considering the

medical evidence and calculating the RFC, "'ALJs must not succumb to the temptation to play

doctor and make their own independent medical findings.'"  *Simpson v. Comm'r of Soc. Sec.*,

344 F. App'x 181, 194 (6th Cir. 2009) (quoting *Rohan v. Chater*, 98 F.3d 966, 970 (7th Cir.

1996)); *see also Isaacs v. Astrue*, No. 1:08–CV–00828, 2009 WL 3672060, at *10 (S.D. Ohio

Nov. 4, 2009) (holding that an "ALJ may not interpret raw medical data in functional terms"

(internal quotations omitted)).

In considering a claimant's case and assessing the RFC, the ALJ must consider all

medical opinions that he or she receives.  20 C.F.R. § 416.927(c).  The applicable regulations

define medical opinions as "statements from physicians and psychologists or other acceptable

medical sources that reflect judgments about the nature and severity of your impairment(s),

including your symptoms, diagnosis and prognosis, what you can still do despite

impairment(s), and your physical or mental restrictions."  20 C.F.R. § 416.927(a)(2).

The ALJ generally gives deference to the opinions of a treating source "since these

sources are likely to be the medical professionals most able to provide a detailed, longitudinal

31

picture of [a patient's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical filings alone . . ." 20 C.F.R. § 416.927(c)(2); *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 408 (6th Cir. 2009). If the treating physician's opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the claimant's] case record, [the ALJ] will give it controlling weight." 20 C.F.R. § 404.1527(c)(2).

If the ALJ does not afford controlling weight to a treating physician's opinion, the ALJ must meet certain procedural requirements. *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004). Specifically, if an ALJ does not give a treating source's opinion controlling weight:

> [A]n ALJ must apply certain factors-namely, the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and the specialization of the treating source-in determining what weight to give the opinion.

*Id*. Furthermore, an ALJ must "always give good reasons in [the ALJ's] notice of determination or decision for the weight [the ALJ] give[s] your treating source's opinion." 20 C.F.R. § 416.927(c)(2). Accordingly, the ALJ's reasoning "must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Friend v. Comm'r of Soc. Sec.*, 375 F. App'x 543, 550 (6th Cir. 2010) (internal quotation omitted). The Sixth Circuit has stressed the importance of the good-reason requirement:

> "The requirement of reason-giving exists, in part, to let claimants understand the disposition of their cases," particularly in situations where a claimant knows that

> his physician has deemed him disabled and therefore "might be especially bewildered when told by an administrative bureaucracy that she is not, unless some reason for the agency's decision is supplied." *Snell v. Apfel*, 177 F.3d 128, 134 (2d Cir. 1999). The requirement also ensures that the ALJ applies the treating physician rule and permits meaningful review of the ALJ's application of the rule. *See Halloran v. Barnhart*, 362 F.3d 28, 32–33 (2d Cir. 2004).

*Wilson*, 378 F.3d at 544–45. Thus, the reason-giving requirement is "particularly important when the treating physician has diagnosed the claimant as disabled." *Germany-Johnson v. Comm'r of Soc. Sec.*, 313 F. App'x 771, 777 (6th Cir. 2008) (citing *Rogers*, 486 F.3d at 242). There is no requirement, however, that the ALJ "expressly" consider each of the *Wilson* factors within the written decision. *See Tilley v. Comm'r of Soc. Sec.*, 394 F. App'x 216, 222 (6th Cir. 2010) (indicating that, under *Blakley* and the good reason rule, an ALJ is not required to explicitly address all of the six factors within 20 C.F.R. § 404.1527(c)(2) for weighing medical opinion evidence within the written decision).

In the instant case, the ALJ rejected the lifting and postural limitations that Dr. Sheets, Plaintiff's treating physician, opined. She reasoned that the limitations Dr. Sheets opined, "especially regarding [Plaintiff's] postural activities, are not supported by the objective findings in the record." (R. at 77.) She also added that Dr. Sheets' "limitation to no stooping prevents an individual from sitting," which she found to be inconsistent with his opinion that Plaintiff could sit for 8 hours in an 8-hour day. (*Id.*) The ALJ instead relied upon the opinion of a state-agency reviewing physician who rendered her opinion in August 2012.

Significantly, the evidence generated after August 2012 is substantial. For example, subsequent to Dr. Manos' August 2012 opinion, Plaintiff underwent yet another back surgery that involved decompression of nerve roots, an additional laminectomy and facetectomy, a foraminotomy, and a complete diskectomy with lumbar spinal fusion. (R. at 395-97, 635-39.)

As with the first surgery, Plaintiff initially experienced symptom improvement.  With time, however, her symptoms returned along with new, more severe symptoms.  (*See, e.g.*, R. at 613, 615, 655-56, 664.)  In addition, Plaintiff required a lumbosacral brace (R. at 660, 615.) Findings from x-rays and a CT scan reflected that Plaintiff was not healing as expected with regard to the osseous/bone bridging across the disc space where the fusion was performed.  (R. at 653-54, 664-65.)  The CT scan also showed central canal and lateral recess stenosis attributable to disc bulging and disc protrusion and scar tissue about a nerve root.  (R. at 653-54.)  An MRI confirmed that scar tissue encased a nerve root and produced moderate foraminal narrowing, as well as disc extrusions and central canal impingement.  (R. at 651.)  Based upon these objective findings, his examination findings, and Plaintiff's failure to respond to more conservative treatments, Dr. Chen discussed potential treatment options with Plaintiff, including a trial of a spinal cord stimulator, pain management, and a third surgery in which he would not only revise her prior fusion, but also extend the fusion up to her L4-L5 levels.  (R. at 664-65.)

Even though the ALJ references some of these records in her decision, she fails to articulate why or how they support her conclusion that Plaintiff's RFC remained unchanged from the RFC Dr. Manos opined in August 2012 or how they support her rejection of Dr. Sheets' opinion that Plaintiff cannot lift weight exceeding 8 pounds more than 1/3 of the day and cannot lift less than eight pounds frequently.  Such a failure is typically not problematic where the bases for the ALJ's conclusions are obvious from the record or where the ALJ relies upon the opinions of other acceptable sources who have considered the record in its entirety.

But that is simply not the case here.  Indeed, as discussed above, the ALJ's decision reflects that she erroneously construed the record with regards to her step-three findings.

Because such a link between the post-August 2012 evidence and any particular limitation is not obvious, the ALJ's lack of articulation prevents this Court from conducting meaningful review to determine whether substantial evidence supports her decision.  *See, e.g., Evans v. Comm'r of Soc. Sec.*, No. 1:10–cv–779, 2011 WL 6960619, at *14, 16 (S.D. Ohio Dec. 5, 2011) (Report and Recommendation), adopted, 2012 WL 27476 (S.D. Ohio Jan. 5, 2012) (remanding where the Court was "unable to discern from the ALJ's opinion how he arrived at the RFC decision and what evidence he relied on in making that decision," explaining that "[s]imply listing some of the medical and other evidence contained in the record and setting forth an RFC conclusion without linking such evidence to the functional limitations ultimately imposed in the RFC is insufficient to meet the 'narrative discussion' requirement of SSR 96–8."); *Perkins v. Commissioner of Social Sec.*, No. 1:10-cv-233, 2011 WL 2457817, at *5–6, 9 (S.D. Ohio May 23, 2011) (Report and Recommendation), adopted, 2011 WL 2443950 (S.D. Ohio June 16, 2011) (same); *Allen v. Astrue*, No. 5:11CV1095, 2012 WL 1142480, at *8 (N.D. Ohio Apr. 4, 2012) (remanding where "the ALJ failed to properly articulate the RFC calculation," explaining that the Court was "unable to trace the path of the ALJ's reasoning"); *Commodore v. Astrue*, No. 10-295, 2011 WL 4856162, at *4, 6 (E.D. Ky. Oct. 13, 2011) (remanding action "with instructions to provide a more thorough written analysis," where the ALJ failed to articulate the reasons for his RFC findings such that the Court could not "conduct a meaningful review of whether substantial evidence supports the ALJ's decision").

35

Although the ALJ's failure to sufficiently explain the reasoning supporting her RFC determinations requires remand, the Undersigned notes that the ALJ's alternative reason for rejecting Dr. Sheets' opinion, that it is internally inconsistent, is also not supported by substantial evidence.  As set forth above, in completing the form, Dr. Sheets had to choose between "never," "occasionally" (defined as "cumulatively 1/3 or less of an 8 hour day"), and "frequently" (defined as "cumulatively more than 1/3 up to 2/3 of an 8 hour day").  (R. at 145.) Dr. Sheets selected "never" with regards to the frequency with which Plaintiff could stoop and also opined that she could sit for 8 hours per day with standing breaks every thirty minutes. Stooping is "bending the body downward and forward by bending the spine at the waist."  SSR 83-14; SSR 85-15.  Contrary to the ALJ's conclusion, a determination that an individual cannot stoop up to 1/3 of a day does not necessarily mean that an individual cannot sit.  Put another way, and individual can sit without stooping or bending their body downward and forward by bending the spine at the waist.  Indeed, the Commissioner's regulations contemplate such a situation.  *See* SSR 96-9p ("A *complete* inability to stoop would significantly erode the unskilled sedentary occupational base . . . .  Consultation with a vocational resource may be particularly useful for cases where the individual is limited to less than occasional stooping.").

In sum, the Undersigned cannot conclude that substantial evidence supports the reasons the ALJ offered for rejecting Dr. Sheets' opinion in favor of an August 2012 opinion of a state-agency reviewing physician.  Moreover, the ALJ's lack of articulation with regards to her RFC determination prevents this Court from conducting meaningful review to determine whether substantial evidence supports the limitations assessed and the nondisability determination.

36

Accordingly, it is **RECOMMENDED** that Plaintiff's third contention of error be **SUSTAINED**.

## VII.    DISPOSITION

Due to the errors outlined above, Plaintiff is entitled to an order remanding this case to the Social Security Administration pursuant to Sentence Four of 42 U.S.C. § 405(g). Accordingly, it is **RECOMMENDED** that the Court **REVERSE** the Commissioner of Social Security's non-disability finding and **REMAND** this case to the Commissioner and the ALJ under Sentence Four of § 405(g) for further consideration consistent with this Report and Recommendation.

## VIII.    PROCEDURE ON OBJECTIONS

If Plaintiff seeks review by the District Judge of this Report and Recommendation, he or she may, within fourteen (14) days, file and serve on all parties objections to the Report and Recommendation, specifically designating this Report and Recommendation, and the part in question, as well as the basis for objection.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b). Response to objections must be filed within fourteen (14) days after being served with a copy. Fed. R. Civ. P. 72(b).

Plaintiff is specifically advised that the failure to object to the Report and Recommendation will result in a waiver of the right to *de novo* review by the District Judge and waiver of the right to appeal the judgment of the District Court.  *See, e.g.*, *Pfahler v. Nat'l Latex Prod. Co.*, 517 F.3d 816, 829 (6th Cir. 2007) (holding that "failure to object to the magistrate judge's recommendations constituted a waiver of [the defendant's] ability to appeal the district court's ruling"); *United States v. Sullivan*, 431 F.3d 976, 984 (6th Cir. 2005)

(holding that defendant waived appeal of district court's denial of pretrial motion by failing to timely object to magistrate judge's report and recommendation).  Even when timely objections are filed, appellate review of issues not raised in those objections is waived.  *Robert v. Tesson*, 507 F.3d 981, 994 (6th Cir. 2007) ("[A] general objection to a magistrate judge's report, which fails to specify the issues of contention, does not suffice to preserve an issue for appeal . . . .") (citation omitted)).


Date: July 26, 2016                              */s/ Elizabeth A. Preston Deavers*
                                                 ELIZABETH A. PRESTON DEAVERS
                                                 UNITED STATES MAGISTRATE JUDGE